## IN THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **CHASE AND MARJORIE PEDEN,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No.:** |
| **v.** ) | |
| ) | **Jury Trial Demanded** |
| **GLENN AND CAROLE STEPHENS,** ) | |
| ) | |
| **Defendants** ) | |

## COMPLAINT

Plaintiffs Chase Peden and Marjorie Peden hereby submit this complaint for defamation, violations of 42 U.S.C. §1983, violations of 42 U.S.C. §1985, and intentional infliction of emotional distress against the above-named defendants, as specified below.

### Nature of the Case

1.

This is a case involving a spurned lover, who, when she could no longer exert control over her former lover, sought to destroy his and his wife's lives. This case is also about her husband, a high-profile local politician who used his political power and influence to both keep her name out of the public eye and to punish her former lover. Both individuals knew or should have known that their behavior was

illegal and damaging, and yet they persisted in a course of action with the obvious intention of destroying a family.

## Parties

2.

Plaintiff Marjorie ("Margie") Peden is a citizen of the state of Georgia.

3.

Plaintiff Chase Peden is a citizen of the state of Georgia.

4.

Defendant Carole Stephens is a resident of the state of Georgia and can be served at 1715 Winding Creek Cir Snellville GA 30078.

5.

Defendant Glenn Stephens is a resident of the state of Georgia and can be served at 1715 Winding Creek Cir Snellville GA 30078.

## Jurisdiction and Venue

6.

The jurisdiction of this court is invoked pursuant to 28 U.S.C. §§1331 and 1367. Plaintiff asserts causes of action under 42 U.S.C. §§1983 and 1985. Additionally, plaintiffs assert pendant state law claims for defamation and intentional infliction of emotional distress.

7.

All acts or omissions alleged in this complaint have occurred in the Northern District of Georgia, and therefore venue is properly within this district under 28 U.S.C. §1391(b)(2). Furthermore, the defendants reside in this judicial district.

**Facts**

8.

Plaintiff Chase Peden was employed with the Gwinnett County Sheriff's Department from March 2004 through March 23, 2018.

9.

In spring 2014, Plaintiff Chase Peden and Defendant Carole Stephens began a consensual extramarital affair.

10.

Around the time the affair began, the first of many anonymous letters was mailed to the Plaintiffs' church, Grayson United Methodist Church ("GUMC"), where Mrs. Peden served as a youth volunteer.  This anonymous letter accused Mrs. Peden of being seen in the company of men other than her husband but provided no further details.

11.

Soon thereafter, another anonymous letter was mailed to the senior pastor of GUMC, repeating the same accusations that Mrs. Peden had been seen in the company of men other than her husband, again providing no other details.

12.

GUMC took no action on the letters, because the staff had a policy of not accepting anonymous letters. Both letters were destroyed by church employees, but their existence and substance can be verified by current or former church employees.

13.

In 2015, an anonymous letter was mailed to Margie Peden at the Peden's home, stating that Chase was seen with another woman. The letter was merely signed by "a friend."

14.

In 2015, yet another anonymous letter was left on the garbage can of other members of GUMC, the Gann family. Shockingly, this letter was addressed to the Gann's teenage daughter, asking her to tell her mother that Margie Peden was seen in the company of another man. Once again, this letter was signed by "a friend in our group." Upon Mr. Gann's discovery of this anonymous note, Mrs. Gann texted

Margie Peden, letting her know about its receipt.  Mrs. Peden asked Mrs. Gann to let the pastor at GUMC know.

15.

The Gann family lives in the same neighborhood as the Defendants.

16.

In spring 2015, Margie Peden's car was vandalized in the parking lot of Grayson High School while she and her husband Chase Peden were attending a school function. The side of her car was "keyed," and a nail was inserted in her back left tire. Upon discovering the damage, Mr. Peden filed a police report and an insurance claim.

17.

Plaintiff Chase Peden confronted Defendant Carole Stephens about the vandalism to Margie Pedens' car, and Mrs. Stephens admitted to Mr. Peden that she had done the damage and agreed to pay the Peden's insurance deductible for the repairs. She made two cash payments to Mr. Peden to cover the deductible. Upon information and belief, Ms. Stephens also admitted this vandalism to investigators in the Gwinnett County District Attorney's Office and, more specifically, to Gwinnett County District Attorney Danny Porter.  The DA's office

said they would file no charges for this damage since Mr. Peden was just as much to blame for Mrs. Stephens's criminal conduct as she was.

18.

On March 30, 2015, an anonymous letter was mailed to Margie Peden at her current employer, Speed, Seta, Martin, Trivett, and Stubley ("SSMTS"), accusing Chase Peden of having an affair with a young woman and claiming that he had brought the woman into the family home. This letter was signed, "Your friends who care for you."

19.

On November 12, 2015, an anonymous letter was mailed to the Peden's daughter, who was 14 years old at the time. This time, the letter stated, "Don't let your mom fool you. She has a good looking boyfriend."  Mrs. Peden was horrified that her minor daughter received a communication from an individual who, by this time, Mrs. Peden believed to be mentally or emotionally unstable.  At this point, Mrs. Peden became frightened for her daughter's safety.

20.

On March 23, 2016, an anonymous letter was mailed to Paul Gann at his business, a member of the same family who had received the earlier March 25,

2015 anonymous letter. This letter stated, "My wife and I saw Margie Peden out with another man. This is a concern since she is a teacher in our church."

21.

On March 31, 2016, another anonymous letter was mailed to the Peden's minor daughter at the Peden's home. This letter stated, "Some of our scout leaders know that your mom has been having an affair for over a year and your dad has a cute girlfriend. Your Girl Scout friends are here to help you if you want to talk." This letter was particularly unnerving to Margie Peden, as the letter writer seemed to know that Margie and her daughter were leaving on a Girl Scout trip the following week and therefore knew intimate details of their lives.

22.

On April 12, 2017, an anonymous letter was mailed to Margie at SSMTS, with a return address of GUMC, and it contained pictures of Chase Peden and the Pedens' vehicles taken by someone in close proximity to them.

23.

On or about April 28, 2017, Mrs. Peden received a voicemail at her secondary employer, Covenant Counseling ("Covenant"), from an anonymous woman who claimed that Chase Peden no longer wanted Mrs. Peden and warning her to watch her husband more closely. According to the voicemail system, the call

came from number 470-214-7850. Upon receiving this voicemail, Margie sent a text to that number, asking the caller to identify herself. The caller refused, but replied, "You can try and block this but we still talk and meet we are good together."

24.

Margie Peden continued to receive text messages periodically from that same number through February 15, 2018, at which time Margie Peden blocked the number from her phone. Margie Peden is a deeply religious Christian woman, and her text responses in this conversation bear out her character. Rather than attacking the woman, Margie Peden tells her multiple times that she's praying for her and is hopeful she will find peace. Nonetheless, Ms. Peden found the text messages frightening, and when she would receive one, each time she would feel very distressed that she was being stalked by an individual who seemed to know her every move.

25.

Mrs. Peden was subsequently informed by DA Danny Porter that Carole Stephens admitted that the number above belongs to her burner phone when Mrs. Stephens was interviewed by the Gwinnett County Dist. Atty.

26.

On June 23, 2017, a postcard was mailed by someone who identified themselves only as "Melissa" to GUMC. The postcard accused Chase Peden of having an affair and stated that Margie and the Peden's children "need your help."

27.

On November 10, 2017, an anonymous letter was sent to Margie at Covenant, which stated, "Thank you for sharing your husband."

28.

On December 18, 2017, another anonymous letter was mailed to Margie Peden at SSMTS. This letter was even more distressing to Ms. Peden, because it included photos of both her car and Mr. Peden's county-issued Sheriff's patrol car. This letter stated "Recognize your car? Of course you do, it has duct tape on the roof! Like your new refrigerator? Doesn't make our falling apart kitchen look better. How is your marriage holding up? You feel good about yourself even though you don't satisfy your husband's needs and he still having an affair?"

29.

In or approximately early December 2017, the Gwinnett County Sheriff's Department received an anonymous letter with a photo of Chase Peden walking toward his County patrol car, accusing him of meeting women at shopping centers.

Chase Peden was told by his supervisor that the department does not take anonymous letters seriously and was cautioned to be aware of his surroundings while off duty, given the photograph. Importantly, Mr. Peden was not reprimanded by his supervisor for using his patrol car to stop by a shopping center on his way home after the end of the shift, as portrayed in the photograph. Chase Peden did not receive a copy of the anonymous letter.

30.

On December 21, 2017, Mr. Peden received an email at cpeden22@gmail.com from carolet@bellsouth.net. Attached to this email was a copy of Margie Peden's Facebook profile picture which portrayed Margie Peden smiling for the camera while Chase Peden kisses her on the cheek. The subject line said simply, "How cute."

31.

On December 26, 2017, Margie Peden received a text message from 470-214-7850 with a photo of Chase Peden standing near the Pedens' red Acura.

32.

On December 28, 2017, an anonymous letter was received by Gwinnett County Sheriff's Department, but this time the letter accused Chase Peden of having sex with women while on duty and bragging about it to colleagues within

the Sheriff's Department. The letter was signed, "Michael." Mr. Peden did not know a Michael within the Sheriff's Department.

33.

On December 28, 2017, Chase Peden returned to work after taking some vacation days for Christmas. Upon his return to work, he was summoned to a supervisor's office and told that he was being reassigned to the jail detail (a less desirable position), because the supervisor claimed that Mr. Peden had provided false information.

34.

When Mr. Peden reviewed the final disposition sheet for his internal case leading to the transfer from transport to jail detail, it showed that his supervisors had recommended the suspension of one day for giving false or misleading information (supposedly relating to information about a colleague that Peden had reported to his supervisor), a charge that was not substantiated by evidence.

35.

In a departure from normal operating procedure, Sheriff Conway himself intervened in Peden's internal case, overruling the suggested discipline and determining instead that he should be transferred out of transportation. As part of

this transfer to jail detail, Peden's county patrol car was returned, and he was instructed to surrender his county cell phone.

36.

Mr. Peden is unaware of any other instances in which Sheriff Conway overruled the suggestions of his Majors or Captains and imposed a much harsher discipline on a deputy, particularly for infractions for which there was little to no evidence of a deputy's wrongdoing.  As a result, Mr. Peden was unfairly targeted for such harsh discipline but did not yet understand the reason.

37.

On December 28, 2017, Mr. Peden received an email from carolet@bellsouth.net asking, "Are you mapping it AMPing your wife on your family Christmas vacation?"

38.

On or about December 28, 2017, Margie Peden received a Facebook friend request from a "Brenda Freeman," a name she did not recognize. The profile for Brenda Freeman was mostly blank and did not include any pictures of the individual, leading Ms. Peden to believe that the profile had just been created. The request contained a copy of Margie Peden's profile picture, described above, and stated, "Too bad he is having an affair!!"

39.

On December 29, 2017, Chase Peden took a week-long vacation before his scheduled shifts at the jail began on January 9, 2018. During his vacation, he requested to be assigned to the courthouse instead of the jail but his request was denied.

40.

Thus, on January 9, 2018, Chase Peden's jail detail shifts began.

41.

On February 2, 2018, yet another anonymous letter was mailed to SSMTS. This letter included multiple false accusations, a reference to Mrs. Peden's Facebook page (which has privacy settings so that a stranger cannot see it), and a reference to Chase Peden's whereabouts on January 5, 2017.

42.

Chase Peden met Carole Stephens on January 5, 2017, a fact he admitted to the Sheriff's Department as part of an internal investigation, detailed in the following paragraphs.

43.

On February 27, 2018, Mr. Peden was interviewed by a Lieutenant in the Sheriff's internal affairs department about an anonymous letter the Lieutenant said

was dated December 26, 2017 (and received by the Dept. on December 28, 2017) and which prompted an internal case investigation against Chase Peden. Peden was given the opportunity to see the letter and told the Lieutenant that it was filled with false accusations. Nonetheless, he was asked to return a couple days later to take a polygraph test and he agreed to do so.

44.

The internal investigation that resulted from the anonymous letter was initiated in direct contravention to the Sheriff's Department's stated policy, conveyed to Mr. Peden only months earlier, that it does not investigate anonymous allegations.

45.

On or about February 27, 2018, Chase Peden called Carol Stephens to ask her whether she had mailed the December 26, 2018 letter to the Sheriff's Department. While she denied sending it, the letter referenced the meeting between Chase Peden and a woman at Collins Hill Fire Station on January 5, 2017. Carole Stephens was that woman. During the call with Mrs. Stephens, Mr. Peden told her that he brought up her name to the Lieutenant at the Sheriff's Department, and she became irate that he had done so.

46.

On March 1, 2018, Mr. Peden returned to the Sheriff's Department to take a polygraph test. The Sergeant who administered the polygraph test informed Peden that he had failed two questions that were asked: (1) whether he had ever had sex while on duty and (2) whether he had ever had sex in his county patrol car. The Sergeant asked him why he had failed those two questions, and Mr. Peden's explanation was that he was probably thinking about a time years earlier during which he had met his wife at home for lunch for a mid-day tryst, and admitted that technically it would have occurred while he was still on duty but on break. However, he was adamant that he had never had sex in his patrol car or met other women while on duty. After the polygraph test, the Lieutenant informed Peden that his superiors would hear about the results but that "this does not look good for you."

47.

On March 15, 2018, Mr. Peden was called in by two majors in the Sheriff's Department and asked if he wanted to resign in lieu of being terminated. They told him he had 24 hours to make a decision.

48.

On March 16, 2018, Peden was asked to meet with Chief Solis of the Sheriff's Department and others, and in this meeting he was given a "notice of intent to terminate" and placed on administrative leave. The Chief told Peden not to contact three women, one of whom was Carole Stephens. When Peden asked if any of them had complained, he was told that one of them did.

49.

On March 19, 2018, Mrs. Peden received an anonymous postcard at SSMTS. The postcard stated, "Ms. Peden, Chase and I had something special but for some reason he couldn't keep his mouth shut.  We had a deal. I knew about the other women but not the others here at the jail. Now I'm being investigated by PSU and my job at the county is in jeopardy.  He told me he wanted to be with me, I believed him." Despite the fact that this postcard implies that it is sent from a Gwinnett County employee, upon information and belief, and because of her pattern of behavior, it was sent by Carole Stephens masquerading as someone else, perhaps because she knew her name was now part of the internal investigation.

50.

On March 20, 2018, Mr. Peden requested a meeting with the Sheriff. The Sheriff's assistant replied that he could meet with the Chief first, a meeting that was scheduled for March 22, 2018

51.

Thus, on March 22, 2018, Peden had a meeting with the Chief and others regarding his pending termination. At this meeting, he was asked if he wanted to submit any additional information for review of his PSU case, which took Mr. Peden by surprise, as he had never been told before that date that he would have the opportunity to submit information on his own behalf. Chief Solis gave him until noon on March 23, 2018 (less than 24 hours later) to submit any documents in support of his cause. The Chief indicated that Peden's supporting documentation would be submitted to and taken into consideration by Sheriff Butch Conway prior to making the final decision about Peden's termination.

52.

Thus, Mr. Peden scrambled in less than 24 hours to piece together any documentation that would support his continued employment. While the time given by Chief Solis was clearly unreasonable and inadequate, Peden did manage to secure professional references from a lieutenant colonel, three lieutenants, and

two captains in the department, and an additional reference from the owner of a private business at which Peden worked an approved part-time security job on the weekends.

53.

On March 23, 2018, Chase Peden submitted a letter to Sheriff Conway's attention pleading his case, attesting to his innocence of the anonymous allegations, and attaching the professional reference letters that he had managed to secure. Despite the obvious obstacles, he managed to meet the Chief's unreasonable and arbitrary deadline of noon, although he wasn't to know until later just how arbitrary—and irrelevant—the deadline really was.

54.

Subsequently, when Mr. Peden was provided a copy of his termination document, it showed that Sheriff Conway had already made the decision to terminate on March 22, 2018, proving that the documentation Chief Solis requested had made no difference, as it was not received by the Department until a day later and thus could not have been considered in the Sheriff's decision.

55.

On March 28, 2018, Peden met with command staff in the department who informed him that the decision had been made to terminate him, but he was offered

resignation in lieu of termination.  He declined, believing that the charges against him had been largely trumped up, were false, and were investigated in direct contravention of the Department's policy against anonymous letters.

56.

Mr. Peden filed an appeal of termination with the Gwinnett County Merit Board the same day.

57.

Sometime after his termination, Mr. Peden received a copy of the final PSU investigation report. It is noteworthy that none of the allegations made in the anonymous letter proved to be true, despite the allegations having kicked off the investigation in the first place.

58.

Instead, the report cited various infractions of the department's rules and regulations, cited in vague language, as the basis for Mr. Peden's termination.

59.

Mr. Peden was aware of other similarly situated deputies, including command staff, who have admitted to use of their county car for personal use (i.e. stopping at a store in a county patrol car on the way home after a shift) who were

not terminated.  In fact, a lieutenant had admitted using his county car for personal errands at the February 28 meeting with Mr. Peden.

60.

Mr. Peden had suspected, since receiving word of the first anonymous letter sent to the Sheriff's Department, that Carole Stephens was behind them, as he was also aware of the anonymous letters previously sent to his wife and daughter. Further, although Mrs. Stephens adamantly denied sending the anonymous letters when Mr. Peden questioned her about it, he did not find her denials believable.

61.

Once the investigation and termination occurred, he believed that Mrs. Stephens had persuaded her husband, Gwinnett County Administrator Glenn Stephens, to use his influence with Sheriff Conway to have him terminated from the Department.  Mrs. Stephens had warned Mr. Peden in the past that if Glenn Stephens discovered their affair, he would use his position to have Peden terminated.

62.

On April 10, 2018, mere days after Peden's termination and his appeal of the same, Channel 2 News in Atlanta aired an investigative report, detailing the salacious particulars of the false accusations made in the anonymous December 26,

2017 letter.  The reporter had obtained a copy of the letter and showed it as part of his report. The story was picked up by other news outlets and repeated numerous times in the following days both in print and on television. In addition, the initial Channel 2 news report contained clips of the Sheriff's Department video recordings made of the internal meeting in which Peden was shown the anonymous letter, Peden's polygraph test, and the follow-up discussion with the lieutenant who oversaw the test.

63.

Because the recordings were internal to the Sheriff's Department and Peden's appeal of the termination was still ongoing, the video recordings would not have been available at that time to the general public and/or media outlets through an Open Records request. Thus, the only way the media outlets would have obtained them would have been through someone leaking them from the Sheriff's Department.

64.

No one at the Gwinnett County Sheriff's Department or the District Attorney's office has ever been able to tell Chase Peden who leaked the story

about the internal investigation to the media, nor has anyone at either department

seemed concerned in the least about the leak.

65.

Meanwhile, the stalking and intimidation of Mrs. Peden continued.  On May

10, 2018, Covenant received an anonymous letter purporting to be from an

employee.  It stated, "Some of us saw this on Face Book – Why is she even posting

on Face Book when we all know this is not a positive social media site. This look

[sic] very unprofessional and is embarrassing to our practice. This needs to be

addressed, she should be reprimanded and she needs help."  The letter also cites

excerpts and links from the media coverage of Chase Peden's termination, as well

as Margie's "Psychology Today" profile.

66.

On May 16, 2018, Mr. Peden attended a Merit Board arbitration meeting

with his counsel (the undersigned and Carey Olson, who at the time were both

associated with the firm Moore Ingram Johnson & Steele). On the day of the

Arbitration meeting, prior to the formal arbitration even beginning, the County's

attorney offered to overturn the termination, instead making it a resignation with

eligibility for rehire, which Mr. Peden accepted, believing it could help him obtain

future employment and might keep certain employment benefits from being irrevocably lost to him.

67.

On May 21, 2018, Mrs. Stephens continued her campaign to ruin the lives of Plaintiffs and their children, sending the Plaintiffs son and daughter anonymous letters. The letters made accusations about Mr. Peden being with other women. They stated in part, "He threw your mother under the bus. Just think, your dad was not thinking of you (his family) while having sex with all these other women . . . .I am one of the now many women at the jail he was with . . .."  Plaintiffs were obviously distraught that Mrs. Stephens, who was proving to be emotionally unstable, was attempting to intimidate and frighten their children.

68.

On May 22, 2018, Mr. Peden submitted a written letter of resignation to the Sheriff's Department, stating in part, "I have made the personal choice to resign from my position as Master Deputy with Gwinnett County Sheriff's Office. I have had a tremendous career, but unfortunately, was subjected to an unnecessary investigation based on unfounded anonymous allegations. The allegations included claims that I engaged in sexual conduct with mistresses in my county-issued patrol car, allegations that are absolutely false. With no evidence to support same, it was

plastered all over the media, an allegation I may never escape. Thus, I have made the difficult decision to leave my current position. . . ."

69.

On May 22, 2018, an anonymous package was mailed to the Peden's son at home via priority mail, signed from "a friend". Inside the package was a Dr. Suess book *Oh the Places You'll Go*. The Pedens' son was graduating from high school that month.

70.

On May 24, 2018 after Grayson High School's graduation ceremony at Gwinnett Infinite Energy Center, Mrs. Stephens approached Chase Peden from behind and grabbed the back of his arm, then walked away (while the Pedens were exiting the building to meet graduates, including their son).

71.

In early June 2018, the Pedens went to the District Attorney to request that Mrs. Stephens be criminally charged as a result of her continued stalking and harassment, taking with them all of the mounting evidence of her unhinged behavior and conveying their fear of her actions in the future, as she seemed to get only bolder as time went on and was targeting their children.

72.

Mr. Peden informed the D.A.'s office that his affair with Ms. Stephens had ended in 2017.

73.

The District Attorney agreed to investigate the Pedens' claims.

74.

As part of the investigation, the District Attorney's office obtained video footage from a post office in Dacula, GA (from which the package to the Pedens' son originated) that showed Carole Stephens mailing a package on May 22, 2018. There was no one else in the video that the Pedens recognized from that day's footage.

75.

In June 2018, when Mr. Peden was leaving tennis practice at the YMCA in Snellville, he found that the Nissan 350Z he drove had been vandalized with significant key mark scratches down the driver's side onto the back of the car and the convertible top ripped. The Pedens filed a police report about the incident. Mrs. Stephens had previously worked at the YMCA and thus would have been aware they had no security cameras in the parking lot.

76.

On June 21, 2018, Mr. Peden was leaving a Home Depot in Snellville and noticed his Toyota Camry had been vandalized with key mark scratches down the passenger side of the car. Chase called Snellville Police and filed a report and called the DA's investigator, Mike Pearson.  The investigation unearthed the Home Depot security camera footage showing that the car had not been vandalized there. Upon Mr. Peden's information and belief, it was vandalized while Mr. Peden was at tennis practice at the YMCA the previous Tuesday evening, but he did not notice the scratches on the car because they were on the passenger side, which he did not see until approaching the vehicle from that side at Home Depot.

77.

On June 22, 2018, Mr. Peden was asked to meet with the investigator at the DA's office for follow up questions. The investigator asked Mr. Peden questions to confirm that the information in the February 2, 2018 anonymous letter would have been known only to Carole Stephens.

78.

On or about June 22, 2018, District Attorney Danny Porter and his assigned investigator met with Defendants Glenn Stephens and Carole Stephens. The investigator wrote up a report summarizing the meeting, but the Pedens did not

know about either the meeting or the report until Mrs. Peden emailed Investigator Pearson on August 28, 2018 (two months later), requesting an update on the status of the investigation.

79.

The investigator's report noted that Carole Stephens was asked for a meeting with the investigator on June 21, 2018, but she only agreed to meet with anyone in the DA's office unless her husband—the county administrator—could also be present.

80.

Despite the fact that the interviews with Mr. Peden were video recorded, Mrs. Peden learned from the DA's investigator that District Attorney Danny Porter did not record their interview with the Defendants.

81.

Importantly, during this meeting Glenn Stephens admitted to taking two actions that were abuses of power: (1) Stephens admitted to accessing Mr. Peden's cell phone records for his personal review, and (2) he personally contacted Chief Solis to request that his wife's name be left completely out of the internal investigation that led to Mr. Peden's termination.

82.

Upon information and belief, Plaintiffs aver that Mr. Stephens's role in the investigation and termination were far greater than that to which he readily admitted during the interview with the DA's office.  Upon information and belief, Plaintiffs aver that Mr. Stephens improperly exerted control or influence over Sheriff Conway and Chief Solis, going so far as to approve the Sheriff's improper purchase of a "muscle car" for his daily commute to work in an apparent deal between Stephens and Conway.

83.

Through a June 2018 news report, the Pedens learned that Glenn Stephens had approved the purchase of an expensive and extravagant "muscle car," a Dodge Charger "Hellcat," for Sheriff Conway's personal use less than two months of Peden's termination.  The purchase of this vehicle came under intense scrutiny from the local media. Eventually, the Sheriff's Department was required to pay the U.S. Department of Justice back the purchase price of the car after it investigated and found the purchase improper.[1]

---

[1] The money used was given to the county by the Justice Department as part of a program to give federally seized money from drug cases to local law enforcement in furtherance of public protection and safety.  While other instances of improper spending under the program were later discovered, the Sheriff's "Hellcat" purchase

84.

With regard to the DA's office, on October 29, 2018, Mrs. Peden received another anonymous letter at SSMTS.   She immediately contacted the DA's investigator, who instructed her to bring in the letter the following day.

85.

When she did so, she was told that forensics would be run on the letter.

86.

Recently, Mrs. Peden discussed the letter with the investigator, who informed her that forensics had not been run and would not be run in the future on the letter, because the DA had decided not to press any charges against Carole Stephens.

87.

From June 2018 to the present, Plaintiffs have provided the Gwinnett County District Attorney with documentation to support the criminal charges they wanted to press against Carole Stephens.   However, the DA has consistently refused to press criminal charges against her, claiming that they did not have sufficient evidence to charge her.

---

was the one that received the most scrutiny and triggered the larger-scale federal investigation of improper spending.

88.

Plaintiffs believe this refusal to press charges to be part of the larger pattern of corruption and abuse of power exerted in this matter by Glenn Stephens, who has yet again used his political position for his own and his wife's personal gain in influencing the DA not to proceed with any further investigation and not to press charges against Stephens's wife.

## Count One
## Violations of 42 U.S.C. § 1983 (by Plaintiff Chase Peden against Defendant Glenn Stephens)

89.

Plaintiffs incorporate by reference Paragraphs 1-88.

90.

Chase Peden was a 14-year veteran of the Gwinnett County Sheriff's Department, respected both in the Department and in the community, when he was unceremoniously terminated from his position.

91.

Carole Stephens made false statements about Chase Peden. Her false allegations included telling the Sheriff's Department that Mr. Peden was having multiple affairs while on duty and engaging in sex in his patrol car.

92.

Carole Stephens's accusations against Chase Peden were stigmatizing and caused significant damage to his personal and professional reputation.

93.

Her statements were made in connection with Peden's termination, but upon Plaintiff's information and belief, it was Glenn Stephens who influenced the decision to terminate Mr. Peden, whether as revenge for the affair or as a means of destroying Peden's reputation before Peden could damage his or his wife's.

94.

Upon information and belief, Glenn Stephens improperly exercised his political influence as the Gwinnett County Administrator to recommend an investigation against Peden, in contravention of Sheriff's Department policy, and to ultimately convince Sheriff Butch Conway to terminate Peden's employment with the Department.

95.

Upon information and belief, Glenn Stephens orchestrated the leak that made the false allegations against Peden public knowledge.

96.

Peden has not been given a name-clearing hearing.

97.

Thus, Glenn Stephens, acting under color of law through the cloak of his position as Gwinnett County Administrator, has violated Peden's constitutional due process rights by causing reputational damage to Peden in conjunction with the Sheriff's Department's termination of Peden's employment.

98.

Plaintiff Chase Peden is entitled to damages under § 1983 for the denial of his protected liberty interest in his public employment, secured by the Fourteenth Amendment.

**Count Two**
**Violations of 42 U.S.C. § 1983 (by Plaintiffs Chase**
**and Margie Peden against Defendant Glenn Stephens)**

99.

Plaintiffs reassert and reallege the allegations set forth in paragraphs 1-88, as if more fully set forth herein.

100.

Plaintiffs have the right under the Fourteenth Amendment of the U.S. Constitution to equal protection of the laws.

101.

As detailed above, defendant Glenn Stephens, acting under color of law as

Gwinnett County Administrator, deprived Plaintiffs of their rights under the Fourteenth Amendment.

102.

In particular, Defendant Glenn Stephens's actions deprived Plaintiffs of protection by law enforcement against Carole Stephens's prolonged, intentional, and hurtful harassment that should have, and would have, otherwise been afforded them.

103.

As result of Defendant Glenn Stephens's actions, Plaintiffs were further harmed by his apparent efforts to cast Chase Peden in an unfavorable light in the media and to irretrievably harm public opinion of him, bringing financial and emotional harm to the Plaintiffs' family.

104.

Defendant Glenn Stephens took such actions complained of above with knowledge that his actions were in direct violation of the U.S. Constitution and the rights of Plaintiffs.

105.

Defendant Glenn Stephens knew that his actions would deprive Plaintiffs of their constitutional rights but proceeded with the unlawful actions with willful

disregard for the consequences of his actions.

106.

As a direct result of Defendant Glenn Stephens's actions, Plaintiffs have suffered damages which include loss of income, emotional and mental suffering, humiliation, disgrace, injury to their feelings and reputation, and other damages. Such damages exist to this day and are likely to continue into the future, as Mr. Peden's name and likeness have been irrevocably marred by the leak to the media of the confidential details of a private personnel action.

107.

Further, Mrs. Peden has suffered emotional distress and harm to her reputation, for which she has been denied protection of the law.

108.

Plaintiffs are entitled to recover from Defendant Glenn Stephens reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

**Count Three**
**Violations of 42 U.S.C. § 1985 (by Plaintiff Chase**
**against Defendant Glenn Stephens)**

109.

Plaintiffs reassert and reallege the allegations set forth in paragraphs 1-88, as if more fully set forth herein.

Page 34

110.

Plaintiff Chase Peden has a right under the U.S. Constitution to be secure from deprivation of property, which may be restricted only upon due process of law under the Fourteenth Amendment.

111.

Plaintiff Chase Peden, as a public employee subject whose employment is subject to the Gwinnett County Merit Board, has a recognized and protected property interest in his employment.

112.

As a result of the concerted unlawful conspiracy and coordinated actions of Defendant Glenn Stephens and others, Plaintiff Chase Peden was deprived of his right to due process of the law in violation of the Fourteenth Amendment.

113.

The primary, obvious, and improper purpose of the investigation into and termination of Chase Peden was to deprive and infringe upon Mr. Peden's constitutional rights.

114.

Defendant Glenn Stephens and others took the actions complained of above with knowledge that their actions were in direct violation of the U.S. Constitution

and the rights of Plaintiff Chase Peden.

### 115.

Defendant Glenn Stephens and others knew that their actions would deprive plaintiff Chase Peden of his rights. Indeed, such was the sole purpose of Defendant Glenn Stephens's actions. Despite this knowledge, Defendant Glenn Stephens proceeded with the unlawful actions with willful disregard for the consequences of his actions.

### 116.

As a direct result of the concerted efforts of Defendant Glenn Stephens and others, Plaintiff Chase Peden has suffered damages, including loss of income, emotional and mental suffering, humiliation, disgrace, injury to his feelings and reputation, and other damages. Mr. Peden's damages exist to this day, and his emotional suffering and reputational damage in the community is likely to continue into the future, as a result of the libelous Internet footprint of news stories covering his termination.

### 117.

In addition, Plaintiff Chase Peden is entitled to recover reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

**Count Four**
**Violations of 42 U.S.C. § 1985 (by Plaintiffs Chase**
**and Margie Peden against Defendant Glenn Stephens)**

118.

Plaintiffs reassert and reallege the allegations set forth in paragraphs 1-88, as if more fully set forth herein.

119.

Plaintiffs have the right under the U.S. Constitution to be granted equal protection of the laws under the Fourteenth Amendment.

120.

As result of the concerted unlawful conspiracy and coordinated actions of defendant Glenn Stephens and others, plaintiffs were to private of their rights to equal protection of the laws in violation of the Fourteenth Amendment.

121.

The primary, obvious, and improper purpose of Defendant Glenn Stephens's actions were was to deprive and infringe upon the Plaintiffs' constitutional rights.

122.

Defendant Glenn Stephens took the actions complained of above with knowledge that his actions were in direct violation of the U.S. Constitution and the rights of Plaintiffs.

123.

Defendant Glenn Stephens knew that his actions would deprive the Plaintiffs of their constitutional rights. Despite this knowledge, Defendant Glenn Stephens proceeded with the unlawful actions with willful disregard for the consequences of his actions.

124.

As a direct result of the concerted efforts of Defendant Glenn Stephens and others, Plaintiffs have suffered damages, which include loss of income, emotional and mental suffering, humiliation, disgrace, injury to their feelings and reputation, and other damages. Plaintiffs' damages exist to this day, and their emotional suffering, loss of income, and diminished standing in the community is likely to continue into the future.

125.

In addition, Plaintiffs are entitled to recover from Defendant Glenn Stephens reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

126.

Defendant Glenn Stephens, along with his co-conspirators, acted with malice and reckless indifference to plaintiff's federally protected rights, for which punitive damages should be assessed.

## Count Five
## Defamation

127.

Plaintiffs reassert and reallege the allegations set forth in paragraphs 1-88, as if more fully set forth herein.

128.

On or about December 28, 2017, Defendant Carole Stephens published false, defamatory, and disparaging statements about Plaintiff Chase Peden to his employer, the Gwinnett County Sheriff's Department.

129.

The statements made by defendant Carole Stephens detailed herein repeatedly referred to Plaintiff Chase Peden by name, were made of and concerning Plaintiff Chase Peden, and were so understood by those who read or heard them.

130.

The statements made by Defendant Carole Stephens detailed herein regarded Plaintiff's profession and were calculated to injure Plaintiff Chase Peden.

131.

Defendant Carole Stephens's statements that Plaintiff was engaging in numerous affairs with women while on duty and in his patrol car were false and

malicious, causing defamation to Plaintiff Chase Peden.

132.

Upon Plaintiffs' information and belief, Defendant Carole Stephens's statements to the Gwinnett County District Attorney's Office were also false and malicious, subjecting Plaintiff to contempt and defaming him.

133.

By conspiring with others to reveal confidential documents and video from the Sheriff's Department's investigation into Defendant Carole Stephens's allegations about Plaintiff Chase Peden, Defendants caused the defamatory statements identified herein to be published to a wide number of persons in public. Specifically, news articles and stories appeared in the Atlanta Journal-Constitution, on numerous local television news programs, including "11Alive" and WSB-TV, and were seen and read by innumerable persons after the story circulated to even national and international news sources.

134.

The statements described above are false and malicious with the intent to impeach Plaintiff's honesty, integrity, and reputation, and they were calculated to injure his profession.

135.

The statements clearly expose Plaintiff Chase Peden to hatred, contempt, and ridicule because they charge him with misconduct in his employment and poor character and judgment.

136.

Defendants published the defamatory statements with knowledge that they were false or with reckless disregard for the falsity of the statements, causing Plaintiff Chase Peden to suffer damages, including emotional distress and injury to his reputation.

137.

As a proximate result of the above described publication, Plaintiff Chase Peden has suffered loss of his employment, loss of his reputation, shame, injury to his feelings, greatly diminished chances for continued employment in his chosen profession, and difficulty in obtaining employment in any field due to the defamatory content on the Internet about him.

138.

Because of Defendants' malice in publishing false and defamatory statements about Plaintiff Chase Peden, punitive damages should be assessed in an amount to be established at trial.

## Count Six
## Intentional Infliction of Emotional Distress

### 139.

Plaintiffs reassert and reallege paragraphs 1-88 of their complaint, as if set forth fully herein.

### 140.

Defendant Carole Stephens has repeatedly sought to damage or destroy the lives of plaintiffs and their children through her persistent and continued harassment, via anonymous letters, texts, and social media outlets.

### 141.

Defendant Carole Stephens harassed Plaintiff Margie Peden and her children with the obvious intent of causing the Peden family fear and emotional distress.

### 142.

Furthermore, Defendant Glenn Stephens intentionally, deliberately, and recklessly caused severe emotional distress to Plaintiff Chase Peden by defaming him in a public forum, including but not limited to the false and malicious statements set forth herein.

### 143.

The outrageous and egregious actions by Defendants against Plaintiffs were willful, wanton, and intentionally directed to harm Plaintiffs and were of such a

nature as would naturally humiliate, embarrass, frighten, or outrage them.

144.

The acts as set forth herein by Defendants have caused Plaintiffs substantial mental suffering, emotional upset and distress and will in all likelihood cause continued emotional distress due to the reputational damage to Chase Peden, which has affected not only him personally, but his family, because he has not been able to obtain employment since his termination from the Sheriff's Department.

145.

As result of Defendants' extreme and outrageous conduct, Plaintiffs have suffered and will continue to suffer the loss of Chase Peden's job and income, mental pain and anguish, severe emotional trauma, and embarrassment.


WHEREFORE, Plaintiffs respectfully request that the court enter judgment against Defendants on all counts, and grant the following relief:

1.  Award Plaintiff Chase Peden lost pay and benefits resulting from Glenn Stephens's violation of his constitutional rights;

2.  Award Plaintiffs compensatory damages in an amount to be determined by the jury;

3.  Award Plaintiffs punitive damages in an amount to be determined by the

jury;

4.   Award Plaintiffs pre- and post-judgment interest at the maximum legal

rate;

5.   Award plaintiff's attorneys fees and costs; and

6.   Provide such other and further relief as this court may deem just and

proper.

Submitted this 21st day of December, 2018.

**Haughton Law, LLC**

/s/Deborah V. Haughton
Deborah V. Haughton
Georgia Bar No.: 338038
P.O. Box 71206
Marietta, GA 30007
(678) 596-2821 (phone)
debbie@haughtonlaw.net